IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SHAWN CONLEY,                          )
                                       )
          Plaintiff,                   )          Civil Action No. 2:21-cv-01110
                                       )
vs.                                    )
                                       )
JOHN WETZEL, MALINDA ADAMS,            )
K. FEATHER, and ADAM MAGOON,           )
                                       )
          Defendants.                  )

**<u>MEMORANDUM OPINION</u>**[1]

Plaintiff, Shawn Conley ("Conley") commenced this civil action, proceeding *pro se*, against defendants John Wetzel, Malinda Adams, Karen Feather and Adam Magoon ("Defendants"). Conley asserts that Defendants caused him to contract COVID-19 while he was housed at the State Correctional Institution at Mercer ("SCI-Mercer"), thereby violating his civil rights under 42 U.S.C. § 1983. Pending before the Court is Defendants' Motion for Summary Judgment (ECF No. 96). Defendants' Motion for Summary Judgment will be granted in part and denied in part.

## I.    Relevant Procedural History

Conley initiated this civil action in August 2021. After he cured certain procedural deficiencies, the Court granted him leave to proceed in forma pauperis. He filed an amended complaint (ECF No. 19) in October 2021 against multiple defendants including unnamed

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case as authorized by 28 U.S.C. § 636 (ECF Nos. 15, 50). Thus, the undersigned has the authority to decide dispositive motions and enter final judgment.

defendants.  He later filed a Second Amended Complaint (ECF No. 36), which is the operative pleading, in which he identified the Doe defendants.  The Second Amended Complaint asserts claims against Adam Magoon, a corrections officer at SCI-Mercer; Karen Feather, the Corrections Healthcare Administrator at SCI-Mercer; John Wetzel, the former Secretary of the Department of Corrections ("DOC"); and Malinda Adams, the SCI-Mercer Superintendent.  Conley asserts that "[f]rom Aug. 2020, until Jan. 2021, the defendants have neglected safety protocols, and precautions set as preventative measures to contracting COVID-19."  ECF No. 36, p. 4.

Defendants have moved for Summary Judgment (ECF No. 96), and have filed a Brief in Support (ECF Nos. 97, 100), a Concise Statement of Material Facts (ECF No. 99), and an Appendix of Exhibits (ECF No. 98).  Conley has filed a Response to the Motion for Summary Judgment (ECF Nos. 105, 107), a Brief in Support (ECF Nos. 105, 108), a Concise Statement of Material Facts (ECF Nos. 105, 109), Undisputed Material Facts (ECF No. 90) and a Response to Defendants' Concise Statement of Material Facts (ECF Nos. 105, 110).  Defendants have filed a Response to Conley's Statement of Facts (ECF No. 106) and a Reply to Conley's Response to Motion (ECF No. 111).  Finally, Conley has filed a Reply (ECF No. 112) to Defendants' Response (ECF No. 111).  Thus, Defendants' Motion is fully briefed.

## II.   Relevant Factual Background

### A.   COVID-19 Protocols and Conditions at SCI-Mercer

Defendants state that SCI-Mercer has closely adhered to the Center for Disease Control ("CDC") guidance in matters related to the COVID-19 Pandemic. ECF No. 99, ¶ 10. SCI-Mercer followed CDC protocol specific to Correctional and Detention Facilities, the Pennsylvania Department of Health, and its own medical team to ensure the safety of inmates and staff within

the facility.  *Id.*

By the end of March and into April 2020, the DOC significantly reduced its transfers of inmates, limiting the transfers to only ones that were necessary.  ECF No. 99, ¶ 11. Inmates were tested at the sending facility, transported, tested upon arrival at the receiving facility and quarantined.  After a 14-day quarantine, and a negative test, then they were moved to a general population housing unit.  *Id.* ¶ 12-13.

On August 10, 2020, the first inmate at SCI-Mercer tested positive for COVID-19.  *Id.* ¶ 14.  The inmate's entire unit was placed on enhanced quarantine, meaning movement was limited to showers.  All inmates in enhanced quarantine were observed/assessed for symptomology and had their temperatures and pulse oxygen checked twice per day.  *Id.* ¶ 15.  Following the first positive case at SCI-Mercer, which was also one of the first cases within the DOC, Superintendent Adams directed staff to immediately deep clean the housing unit and close down the phones and kiosks to prevent spreading the virus.  On August 27, 2020, SCI-Mercer was locked down for a 72-hour cleaning.  SCI Mercer was the first State Correctional Institution to do a 72-hour institution-wide lockdown and deep clean, with other facilities quickly adopting the same approach.  *Id.* ¶¶ 16-17.

Enhanced quarantine on HB Unit—Conley's unit—was initiated on November 17, 2020, and lifted on December 19, 2020.  ECF No. 99, ¶ 18.  When a unit was placed on enhanced quarantine, initially the inmates were only permitted out to shower daily, one cell at a time.  *Id.* ¶ 19.  If the enhanced quarantine period extended beyond 14 days, then the inmates would be permitted daily access to phones and kiosk in addition to the shower.  *Id.*  Typically, the schedule would be one cell from the bottom tier and one cell from the top tier each a half hour, and they

would be permitted 15 minutes to shower and then 15 minutes to use the phone and kiosk.  *Id*.

Enhanced quarantine for cells 17-20 on HB Unit was initiated on January 1, 2021, and lifted on

January 14, 2021.  *Id*. ¶¶ 18-20.

According to Defendants, various proactive and preventive steps were taken to stop the

spread of the virus.  These preventive steps, initiated in the early stages of the pandemic, included

the following: requiring that all staff and inmates wear masks; screening all incoming and outgoing

inmates; subjecting all staff members to enhanced screening upon entering the facilities;

mandating that inmates showing symptoms of the COVID-19 virus will be isolated and staff with

symptoms will be sent home; limiting inmate movements and mandating 16 and then eight-men

cohorts; and restricting visitation with family and friends to virtual methods.  Additionally, PPE

was provided to all staff members, including masks.  The COVID vaccine and booster shots have

been made available to all inmates who wish to accept them.  *Id*. ¶¶ 24-26.

Defendants assert that staff were regularly issued cleaning chemicals from the maintenance

department.  Block workers were out on the 10 a.m.–6 p.m. shift, daily, cleaning the blocks,

spraying the outside of cell doors and the common areas.  Cleaning chemicals were diluted the

same way during COVID as they were pre COVID.  *Id*. ¶ 48.  From time to time, staff would pass

the spray bottles, through the feeding apertures to inmates to clean their cells.  *Id*. ¶¶ 46-48.

Conley does not dispute that certain protocols were implemented at SCI-Mercer.  Rather,

he claims that while some employees at SCI-Mercer adhered to the protocols, others at SCI-Mercer

would refuse to wear masks, only sometimes wore masks, wore damaged or defective masks, or

wore masks inappropriately.  ECF No. 110, ¶ 10.  He adds that staff members would come to work

despite having tested positive for COVID-19.  *Id*.  Furthermore, inmates were not regularly tested

4

for COVID-19.  *Id.*  Conley notes that Feather admits in her Declaration that mass testing did not occur.[2]  ECF No. 98-5, ¶ 8.

Conley has submitted various exhibits and other documents in support of his claims.  This includes sworn statements from various inmates housed at SCI-Mercer during the relevant time frame.  The declarations attached in his Second Amended Complaint or in his Appendices address mask issues, lack of social distancing and failure to follow COVID protocols.  ECF No. 36; *see also* ECF 110-1.  As it relates to wearing masks, Conley and other inmates state that both officers and administration would not always wear masks.  ECF No. 110-1.

As for Adams, the inmate declarations state that Superintendent Adams did not always wear a mask.[3]  By contrast, Adams states in her declaration that while the mask mandate was in effect, "when doing rounds on the units or interacting with officers and/or inmates, I would always wear my mask."  ECF No. 98-2, ¶ 23.

Conley and the other declarants also claim that Secretary Wetzel knew that Adams was not wearing her mask and violating safety protocols.[4]  Conley also cites to letters from five inmates, including himself, that are addressed Wetzel, informing him of the lax adherence to COVID-19 protocols at SCI-Mercer.[5]  ECF No. 110-1, pp. 27-31.  Defendants dispute that Wetzel received a

---

[2] Feather also states she did not possess the authority to order mass testing.  ECF No. 98-5, ¶ 8.

[3] Adams is alleged to be captured on video without a mask.  ECF No. 110-1, pp. 34-35, 40, 46. This video referenced is not in the record.

[4] None of the declarants have first-hand knowledge that Wetzel was aware of conditions at SCI-Mercer.  Rather, they cite another lawsuit that was filed against Wetzel and other defendants that also relates to conditions at SCI-Mercer.  No evidence of contemporaneous knowledge on the part of Wetzel was proffered by Conley.

[5] These letters are dated August and September 2020.  As for Conley, Defendants submitted the affidavit of Dawn Christiana, an Executive Secretary in the Deputy Secretary's Office. Ms. Christiana maintains a correspondence log of all communications that were sent to the *Footnote continued on the next page…*

letter from Conley in 2020 or 2021.  ECF No. 99, ¶ 50.

There are significant factual disputes over the conduct of Magoon.  Alonzo Davis, an inmate, states, "[O]fficer Magoon comes [sic] to work on [t]wo separate occasions, positive with covid-19.  He told me he was positive out of his own mouth.  Both Times!"  ECF No. 110-1, p. 15.  Likewise, another inmate, Joshua Scheller states, "Former 2-10 regular officer on HB [Unit] Mr. Magoon admitted to the whole block that he was positive for Covid-19.  He even bragged about having it twice.  Talked about how [he] shouldn't even be at work.  Sometimes he wouldn't even wear his mask."  *Id*. at 17.  Further, inmate Antonio Lanko declares, "C.O. Magoon came to work on November 3rd, and November 22nd of 2020, knowing that he was positive for COVID-19."  *Id*. at 18.   Finally, Conley declares, "[Adam Magoon] confessed the [sic] he informed the administration of his [positive COVID-19] medical status, and they encouraged him to come [to work] anyway."  ECF No. 110-1, p. 55, ¶ 12.

On the other hand, Magoon states in his declaration that "I was never told to come to work when I was sick, and I never told any of the inmates that I was instructed to come to work while ill."  ECF No. 98-6, ¶ 17.  He asserts that he always wore his mask when doing his rounds and interacting with other officers and inmates.  ECF No. 98-6, ¶ 4.  According to Magoon, he only experienced symptoms of COVID-19 on November 22, 2020, after which he took a COVID detection test.  Because he tested positive, he did not report to work that day.  *Id*. ¶¶ 10-12.  This was the only time he tested positive.  Further, he denies telling any inmates on HB Unit that he was sick or had a positive COVID test because he was not at work while he had COVID.  *Id*. ¶¶ 14-

_____

attention of the Secretary of Corrections and declares that Wetzel did not receive Conley's letter.  *See* ECF No. 98-7.

15.

There is no dispute about how the cleaning supplies were handled but the parties differ on whether this conduct was appropriate according to pandemic protocol.   Conley asserts that prisoners were given diluted cleaning solutions and were not provided the opportunity to clean. ECF No. 110, ¶ 10.  In response to Conley's assertions about cleaning supplies, Magoon states in his declaration that "We were regularly issued cleaning chemicals from the maintenance department.  The chemicals came in pouches and were poured into a 5 gallon chemical container, diluted with water, and separated into spray bottles, and handed out to the block workers."  ECF No. 98-6, ¶ 18.  "The cleaning chemicals were diluted the same way during COVID as they were pre-COVID.  From time to time, we would pass the spray bottles, through the feeding apertures, to inmates to clean their cells."  *Id.* ¶¶ 19-20.

Conley claims he and other inmates on his block experienced COVID-like symptoms in November 2020, the same month that he claims that Magoon came to work despite testing positive for COVID.  ECF No. 110-1, p. 52.  Conley's own declaration states that healthcare was providing all the medical attention they could for a presumed COVID case.  When he tried to give a sick call note to the nurse who was making rounds, he was told that "everyone is sick, and theirs [sic] nothing we can do for you but give you pain medication, to ease your pain."  ECF No. 110-1, p. 8. He acknowledges that nurses would pass out pain medications when requested and informed inmates that if they did not need a ventilator, they would not need to be removed from their cells as they were already quarantined.  ECF No. 109, ¶¶ 28-29.  Further, when Conley's unit was on enhanced quarantine, nurses checked temperatures and pulse oxygen levels twice a day.  ECF No. 99, ¶ 30.

It is uncontroverted that Conley was not tested for COVID.  According to Feather, she did not have the authority to conduct mass testing because this directive would have to come from the "Central Office."  ECF No. 98-5, ¶ 8.  She also states that there was no direction to nurses or other personnel to refrain from taking sick-call slips.  *Id.* ¶ 9.[6]  According to Feather, had an inmate presented with symptoms of COVID, or another illness, a physician would decide the proper course of treatment and what medications would, or should, be given.  *Id.* ¶ 5. Further, symptomatic inmates were tested in November and December 2020.  *Id.* ¶ 6.

### B.  Availability of Grievance Process at SCI-Mercer

It is undisputed that on March 16, 2020, Superintendent Adams instructed staff to remove the grievance boxes from the units and instead directed staff to add a "Grievance" label to the existing mailboxes to alleviate the burden of collecting the grievances.  ECF No. 98-2, ¶ 4 (Adams Decl.).  The grievance dedicated box remained available in the cafeteria.  Adams states that the inmates were notified of the change and it was advertised on the walls of the housing units.  *Id.* ¶¶ 6-7.  Adams also states that inmates had the option of handing grievances directly to her assistant, Nicole Franz, each week.  *Id.* ¶ 8.  According to Adams, the grievance boxes were placed back on the housing units on October 21, 2020. *Id.* ¶ 9.

Conley disputes that the grievance process was available during the month of November 2020. ECF No. 110, ¶ 1.  He asserts that there was no grievance box on the block and the word "Grievance" was not put on the mailbox.  *Id.*  He states there were no advertisements of a change

---

[6] Conley also makes an unverified claim that the thermometer used to check the inmates' temperature was faulty, ECF No. 110, ¶ 22. Feather states in her declaration that she was unaware of a malfunctioning thermometer but if she had been made aware, she would have expected medical staff to immediately replace it.  ECF No. 98-5, ¶ 10; ECF No. 98-2, ¶ 22.

in the grievance deposit system either.  *Id*.  In addition, Ms. Franz would come to the unit and sign the logbook, but she wouldn't announce her presence or make rounds, and would leave without the inmates knowing she was ever there.  *Id*. ¶¶ 2, 5, 8.  According to Conley, "we were locked in our cells for 23 plus hours a day, we had no access to file grievances, because we had no where [sic] to submit them, no notice, sign, memo or announcement, existed at this time."  *Id.* ¶ 2.[7]

In his deposition, Conley testified that the grievance system was unavailable when he contracted COVID symptoms:

> At this time, we're quarantined, which means we're physically locked in a cell that we cannot get out of without the assistance of a correction officer, 24 hours a day. On our block, there is a box that has the word grievance painted on it, but they had removed that box and placed it in the kitchen area that we're no longer attending. So we can't file a grievance.  Then when the grievance coordinator made her rounds, the grievance coordinator comes on our block, signs the book and then leaves.  Doesn't announce anything.  We had no way of filing a grievance.

ECF No. 98-1, p. 4. When asked when the box was removed from his unit, Conley responded, "Exactly when, I can't tell you, because I don't remember the date when they moved it.  But it definitely wasn't there, probably about a month or two before."  *Id*. at p. 5.  He adds that the grievance box wasn't returned to his housing unit until "Probably, mid-2021?  And I'm not even sure it was mid, might've been later 2021."  *Id*. at pp. 5-6. He acknowledges that he was able to file Grievance #924524 related to COVID vaccines in April 2021.  "But I know for a fact that [the grievance box] wasn't there around the time that we were quarantined, and I know they brought it

---

[7] Conley has submitted declarations from other inmates regarding the lack of an available grievance process.  *See* ECF No. 110-1, Appendices A and E. These verified statements either do not provide a time frame or instead reference the unavailability of a grievance process in April 2020. *See, e.g.*, ECF No. 110-1, pp. 4, 6.  Conley has identified November 2020 as the time frame when inmates in the H Block allegedly experienced COVID symptoms.

back in '21." *Id*. at p. 6.

### III.  Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of showing the absence of a genuine, material dispute and an entitlement to judgment. *See id.* at 323.

Once the moving party has met its initial burden, then the burden shifts to the non-moving party to demonstrate, by affidavit or other evidence, "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A non-moving party must "go beyond the pleadings" and show probative evidence creating a triable controversy. *Celotex*, 477 U.S. at 324. An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *See Hugh v. Butler Cnty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cnty. of Ctr., Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

Although courts must hold *pro se* pleadings to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), at the summary judgment stage a *pro se* plaintiff is not exempt from his burden of providing some affirmative evidence, not just mere allegations, to show that there is a genuine dispute for trial.  *See, e.g.*, *Barnett v. NJ Transit Corp*., 573 F. App'x 239, 243 (3d Cir. 2014) (holding that the *pro se* plaintiff was still "required to designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories…sufficient to convince a reasonable fact finder to find all the elements of her prima facie case") (citation and quotation omitted); *Siluk v. Beard*, 395 F. App'x 817, 820 (3d Cir. 2010) ("[T]he right of self-representation does not exempt a party from compliance with relevant rules of procedural law."); *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (*pro se* plaintiffs "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants.")

## IV.    Discussion

Conley's civil rights claims are brought under 42 U.S.C. § 1983.  He asserts that Defendants violated his constitutional rights under the Eighth and Fourteenth Amendments by exposing him to COVID-19.  More specifically, he states that Superintendent Adams, Healthcare Administrator Feather, and Corrections Officer Magoon neglected safety protocols and preventive measures that should have been implemented to protect inmates from contracting COVID-19.  In addition, Conley alleges that Secretary Wetzel was complicit in the non-compliant behaviors of SCI-Mercer employees.

Conley also has brought state-law claims of "gross negligence" and "emotional distress." ECF No. 36, pp. 6-8, 17, 25, 32.

11

Defendants argue they are entitled to summary judgment because (1) Conley failed to exhaust his administrative remedies and (2) the record lacks sufficient evidence to proceed to trial on any of his claims.

A.  Exhaustion of Administrative Remedies

The PLRA mandates that an inmate exhaust "such administrative remedies as are available" before bringing a suit challenging prison conditions.  42 U.S.C. § 1997e(a).  The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  The Supreme Court has repeatedly observed that the PLRA's exhaustion requirement "is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 578 U.S. 632, 638 (2016) (citing *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) and *Jones v. Bock*, 549 U.S. 199, 211 (2007)).  Exhaustion is mandatory under the PLRA regardless of the type of relief sought and the type of relief available through administrative procedures.  *See Booth v. Churner*, 532 U.S. 731, 741 (2001).  Courts are not given discretion to decide whether exhaustion should be excused, *see Ross*, 578 U.S. at 641, and there is no exception to the exhaustion requirement based on "futility."  *Ahmed v. Dragovich*, 297 F.3d 201, 206 (3d Cir. 2002) (citations omitted).

The PLRA's mandatory exhaustion requirement means not only that a complaint filed before administrative remedies are exhausted is premature and cannot be entertained, but also that a failure to exhaust administrative remedies in accordance with a prison's grievance procedures constitutes procedural default.  That is so because "the PLRA's exhaustion requirement requires

proper exhaustion." *Woodford*, 548 U.S. at 93-95; *see also Spruill v. Gillis*, 372 F.3d 218, 227-30 (3d Cir. 2004).

Importantly, the prison's grievance policy is what "define[s] the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218; *Spruill*, 372 F.3d at 231 ("prison grievance procedures supply the yardstick for measuring procedural default."). Thus, the procedural requirements for exhaustion in a given case are drawn from the policies of the prison in question rather than from any free-standing federal law. The DOC's relevant inmate grievance system is set forth in DC-ADM 804. There are several requirements to filing a proper grievance in accordance with DC-ADM 804. Relevant here, DC-ADM 804 requires that an inmate place his grievance in one of the fixed lock boxes designated for inmate grievances. DC-ADM 804, § 1(B). It also provides that "[e]ach Facility Manager/designee shall ensure that a fixed lock-box designated for inmate grievances is on each general population housing unit…and Inmate Dining Halls." *Id*. (emphasis added.)

Failure to exhaust is an affirmative defense under the PLRA. *See Jones*, 549 U.S. at 216. Defendants have the burden of proving that Conley failed to exhaust his available administrative remedies. *See, e.g.*, *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018). As explained by the Court of Appeals, once a defendant demonstrates that an inmate failed to exhaust his administrative remedies, then "the inmate plaintiff bears the onus of producing evidence that the on-the-books remedies were in fact unavailable to him or her." *West v. Emig*, 787 F. App'x 812, 814 (3d Cir. 2019) (citing *Rinaldi*, 904 F.3d at 268). Absent a situation where administrative remedies are not "available," a court may not excuse an inmate's failure to exhaust "irrespective of any 'special circumstances.'" *Ross*, 578 U.S. at 639.

Here, there is no evidence that Conley filed a grievance at any time prior to April 2021, well after the events at issue. Therefore, Defendants have met their burden to show that Conley failed to exhaust his administrative remedies. As a result, it becomes necessary to determine whether Conley produced evidence that the grievance process was unavailable to him.

The Supreme Court explained in *Ross* that the term "available" means "capable of use" to obtain "some relief for the action complained of." 578 U.S. at 642-43 (quoting *Booth*, 532 U.S. at 738). The Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books," is not "available" because it is "not capable of use to obtain relief": (1) when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when it is "so opaque that it becomes, practically speaking, incapable of use," such as when no ordinary prisoner can discern or navigate it; or (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Rinaldi*, 904 F.3d at 266-67 (quoting *Ross*, 578 U.S. at 644). *See also Hardy v. Shaikh*, 959 F.3d 578, 584 (3d Cir. 2020) (misleading or deceptive instructions from a prison official, as well as clearly erroneous statements, can render a grievance process unavailable).

Conley asserts that the changes to the grievance process that were put into effect were not explained to inmates and the usual grievance boxes were inaccessible. While Adams states that the grievance boxes were returned to the housing units on October 21, 2020, Conley testified that the grievance box was not returned to his housing unit until sometime around April 2021. Therefore, he asserts, he was unable to file a grievance while quarantined and allegedly exposed to and experiencing symptoms of COVID during November 2020. Conley has also submitted

14

declarations from other inmates, all of whom assert that the grievance process was unavailable. *See* Scheller Decl., ECF No. 110-1, p. 37 ("The Grievance was not made available to me.  The grievance box was removed from the block, without any alternative."); Ortiz Decl., ECF No. 110-1, p. 44 ("If I would put a grievance into the mailbox they would send my grievances back and they would said [sic] out into correct box but no block not HB had a grievances box [sic]."); Robinson Decl., ECF No. 110-1, p. 49 ("The grievance procedure was unavailable… No alternative options were ever made available through memos, announcements, or the prison channels.  Ms. Franz would come to the housing unit only to sign and leave.").

Based on this conflicting evidence, there are genuine issues of material fact about the availability of the grievance system in November 2020.  Therefore, Defendants' motion for summary judgment based on the failure to exhaust administrative remedies will be denied.

The Court will now proceed to analyze the merits of Conley's claims against Wetzel, Adams, Feather and Magoon.

B. Eighth Claims against Wetzel, Adams and Feather

Conley asserts that his Eighth Amendment rights were violated by Defendants' failure to follow proper COVID safety measures.

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Section 1983 does not create substantive rights but instead "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

"The first step in evaluating a section 1983 claim is to identify the exact contours of the underlying right said to have been violated and to determine whether the plaintiff has alleged a deprivation of a constitutional right at all." *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (internal quotations and citations omitted). "Next, a plaintiff must demonstrate a defendant's 'personal involvement in the alleged wrongs.'" *Id.* (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). That is because only a person who subjects, or causes to be subjected, another person to a civil rights violation can be held liable under § 1983.

Two requirements must be met to establish a violation of the Eighth Amendment. First, the deprivation of rights must be objectively "sufficiently serious," and second, a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted). "To state a viable failure-to-protect claim, the plaintiff must establish that: (1) he was incarcerated under conditions posing a substantial risk of serious harm; (2) the defendant was deliberately indifferent to that substantial risk; and (3) the defendant's deliberate indifference caused the plaintiff to suffer harm." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012), *abrogated on other grounds by Mack v. Yost*, 968 F.3d 311 (3d Cir. 2020); *Farmer,* 511 U.S. at 834.

The first element sets out an objective inquiry: that the official "knowingly and unreasonably disregarded an objectively intolerable risk of harm." *Id.* at 132. The second element, "deliberate indifference," is a subjective standard: "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001). That is because "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official

knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. The plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842.

Because the element of deliberate indifference is subjective, it "can, like any other form of scienter, be proven through circumstantial evidence and witness testimony." *Pearson v. Prison Health Servs.*, 850 F.3d 528, 535 (3d Cir. 2017). Since a defendant's state of mind, like other facts, can be proved by circumstantial evidence, the *Farmer* standard does not require a defendant admit his consciousness of the risk of serious harm before liability can be imposed. But even gross errors of judgment are not constitutional violations; liability requires subjective, not objective, culpability. *See Farmer*, 511 U.S. at 843 n.8. As the Court of Appeals has explained:

> "Deliberate indifference," therefore, requires "obduracy and wantonness," *Whitley v. Albers*, 475 U.S. 312, 319 (1986), which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (stating that "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm").

*Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (parallel citations omitted).

Defendants argue that Conley cannot establish that they "knowingly and unreasonably disregarded" the threat posed by the COVID-19 virus. As recounted in this opinion, they have submitted compelling evidence that they took proactive and comprehensive measures during the COVID-19 pandemic to protect inmates from the spread of the virus. After the first positive case at SCI-Mercer was reported, that entire unit was placed on enhanced quarantine. ECF No. 99,

17

¶¶ 14-15.  SCI-Mercer was also the "first prison to conduct a 72-hour institution wide lockdown, deep clean, with other facilities quickly adopting the same approach."  *Id.* ¶ 17.  Defendants assert that the DOC as a whole implemented an aggressive approach to the pandemic:

> Requiring that all staff and inmates wear masks; screening all incoming and outgoing inmates; subjecting all staff members to enhanced screening upon entering the facilities; mandating that inmates showing symptoms of COVID-19 virus will be isolated and staff with symptoms will be sent home; limiting inmate movements and mandating 16 and then 8-man cohorts; and restricting visitation with family and friends to virtual methods.  Additionally, PPE was provided to all staff members, including masks.  The COVID vaccine and booster shots have been made available to all inmates who wish to accept them.

*Id.* ¶¶ 24-25.

Conley does not dispute that the DOC mandated a number of measures to address COVID-19.  Rather, he claims that Defendants were deliberately indifferent to the risk to inmate health and safety through the lax enforcement of the COVID protocols.  As it relates to wearing masks, Conley and other inmates note that both officers and administration would not always wear masks.  ECF No. 110-1.  The declarations attached to his Second Amended Complaint or in his Appendices address mask issues, lack of social distancing and failure to follow other COVID protocols.[8]  ECF No. 36; *see also* ECF No. 110-1.

Notably, however, numerous district courts have held that "where a detention facility has taken concrete steps toward mitigating the medical effects of COVID-19, an incarcerated person will fall 'well short' of establishing that the facility and its staff were deliberately indifferent toward his medical needs in light of the virus even though they cannot entirely 'eliminate all risk' of contracting COVID-19, notwithstanding even serious preexisting medical conditions the

---

[8] Statements in the declarations about Magoon are addressed at a later point in this opinion.

prisoner may have." *Pumba v. Kowal*, 2022 WL 2805520, at *4 (E.D. Pa. July 18, 2022) (quoting *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 330-331 (3d Cir. 2020)).  In that case, the court rejected a claim based on a sergeant permitting a pod worker who tested positive to clean the plaintiff's cell without wearing a mask and presumably exposing him to COVID-19.  The court further noted that the plaintiff alleged that the sergeant acted negligently, resulting in the spread of the virus, but "a claim based on mere negligence is insufficient to allege a plausible Eighth Amendment violation." *Id.* at *5.  *See also Greene v. Ellis*, 2022 WL 4288279, at *3 (D. N.J. Sept. 16, 2022) (prisoner alleged that jail did not provide adequate social distancing and that there was not a mask exchange program, but this was insufficient); *Chapolini v. City of Philadelphia*, 2022 WL 815444, at *15 (E.D. Pa. Mar. 17, 2022) (allegations that prisoner was housed with multiple cellmates who did not go through proper quarantine insufficient).

Thus, even accepting as true Conley's allegations that conditions at SCI-Mercer were not compliant at all times with guidance of the CDC specific to correctional and detention facilities, as well as the Pennsylvania Department of Health, and its own medical team, these allegations do not support a claim of deliberate indifference.  As Judge Lenihan observed in a similar case: "Simply because the execution of COVID-19 protocols may have been nonoptimal at times, the alleged deficiencies fall well short of evidencing deliberate indifference by the named Defendants." *Jones v. County of Allegheny*, 2022 WL 2806779, at *6 (W.D. Pa. June 24, 2022).  *See also Easley v. Wetzel*, 2021 WL 1200214, at *6 (W.D. Pa. Feb. 26, 2021), *report and recommendation adopted*, 2021 WL 1197483 (W.D. Pa. Mar. 30, 2021).

As this analysis demonstrates, Conley has not met his burden to proffer facts that support a claim of deliberate indifference on the part of Wetzel, Adams or Feather.  Moreover, his claims

also fail because there are no genuine issues of material fact that show their personal involvement in any deprivation of his constitutional rights.

To proceed with a claim against a defendant, a plaintiff must establish a defendant's personal involvement in the alleged deprivation of his constitutional right. *See, e.g.*, *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). That is because, as stated in the text of § 1983 itself, only a person who "subjects, or causes to be subjected" another person to a civil rights violation can be held liable under § 1983. Thus, each defendant is liable only for his or her own conduct. *See, e.g.*, *id.*; *see also Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016); Barkes v. First Correctional Med., 766 F.3d 307, 316 (3d Cir. 2014) (rev'd sub. nom. on other grounds 575 U.S. 822 (2015)); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 173 (3d Cir. 2005) ("To impose liability on the individual defendants, Plaintiffs must show that each one individually participated in the alleged constitutional violation or approved of it.") (citing *C.H. v. Oliva*, 226 F.3d 198, 201-02 (3d Cir. 2000) (en banc)).

Conley's claim against Secretary Wetzel fails because there is no evidence that he was personally involved with, directed or acquiesced in any lax implementation or enforcement of COVID protocols at SCI-Mercer. While Conley has supplied a letter that he claims that he sent to Wetzel in which he communicated his concerns (as well as letters he alleges were sent by other inmates), there is no record evidence that Wetzel received a letter from Conley,[9] nor has Conley

---

[9] In addition to his own letter, Conley submitted letters purporting to be from inmates Lanko, Robinson and what appears to be Gauman. ECF 110-1, Appx. D. Conley also has submitted six declarations which reference these letters, three of which are not from the alleged correspondents. In their declarations, Lanko, Robinson and Gauman did not authenticate the letters purportedly written by them. They do not even state that they personally sent a letter to Secretary Wetzel. Additionally, the six declarations have virtually verbatim statements that reference Defendants' *Footnote continued on the next page…*

submitted any admissible evidence that Wetzel was aware of any lax conditions at SCI-Mercer.[10]
ECF No. 99, ¶ 50.  Thus, Conley has failed to set forth evidence sufficient to create a triable issue
of fact as to whether Wetzel had the requisite personal involvement in in the alleged constitutional
violations.

As for Superintendent Adams, she states that during the time period when the indoor mask
mandate was in effect, she always wore her mask when doing rounds on the units or interacting
with officers and/or inmates.  *Id.* ¶ 23.  While Conley has submitted conflicting evidence, he has
failed to show that even if true, Adams' failure to wear a mask on a particular occasion reflects
deliberate indifference.  Indeed, it is undisputed that as superintendent of SCI-Mercer, Adams
implemented a number of aggressive and proactive measures to address COVID.  There is no
evidence that she knew of an excessive risk of inmate health and deliberately disregarded that risk.
As noted by the Court of Appeals: "In light of these measures and the unprecedented and evolving
nature of the pandemic, [plaintiff] does not have a plausible claim that prison officials disregarded

---

Exhibit 7, the Christiana Declaration about Conley's letter, and essentially state as follows: "the
transcription of correspondence stops on June 6, 2019 yet 'these letters' were written and sent in
2020 during the lockdown."  *See* ECF No. 110-1, Appx. E, pp. 34, 41, 47, 53, 61 and 67.  This
statement reflects a misunderstanding of Defendants' Exhibit 7, which lists the DOC's
correspondence tracking information for Conley and shows an absence of entries for 2020 and
2021, evidencing that Secretary Wetzel did not receive a letter from Conley in either year.

[10] Inmate declarations submitted by Conley (ECF No. 110-1, Appx. E) cite to another lawsuit filed
in this district, *Brown v. Wetzel,* 2:20-cv-512, and video footage from that lawsuit, which Conley
says proves that Wetzel knew that Adams and others weren't following COVID safety protocols.
The video footage referenced is not part of the record in this case and therefore cannot be
considered.  Moreover, the fact that allegations about SCI-Mercer were made against Wetzel,
Adams and Feather in another case is insufficient to demonstrate the truth of these allegations or
Wetzel's contemporaneous knowledge of alleged civil rights violations.  Indeed, many of Brown's
allegations relate to different issues.  *See Brown,* ECF No. 16, 32.

an excessive risk of harm." *Mincy v. Governor of Pennsylvania*, No. 21-3263, 2022 WL 4115485, at *2 (3d Cir. Sept. 9, 2022).

Conley has submitted declarations from several inmates who state that they told Adams that staff were not complying with the masking protocol.[11]   None of the declarations provide a time frame in which they spoke to Adams.  All of the declarants state that Adams advised them to continue to wear their masks, and several also acknowledge that Adams stated that she would look into the situation.  No declarant has any personal knowledge about any actions Adams may have taken based on the information with which she was provided.  As previously discussed, Adams implemented many measures to combat the spread of COVID, and even assuming that COVID-19 protocols may have been nonoptimal at times, the fact that individuals in the prison sometimes failed to comply with the mask policy fall well short of evidencing deliberate indifference by Adams.

Finally, at least one declarant states that he and other inmates told Adams that Magoon had come to work in November 2020 knowing that he had tested positive (ECF No. 110-1, p. 18). Even viewing the evidence in the light most favorable to Conley, there is no evidence that Adams was personally involved in the incidents involving Magoon in November 2020.  Adams cannot be

---

[11] In his declaration, inmate O'Day described two officers who weren't wearing masks and states, "A few of us has [sic] said something to Ms. Adams about [sic] she said just make sure we have our masks on."  ECF No. 107-1, p. 16.  Inmate Scheller stated, "I ask [sic] Ms. Adams about dishing out consequences for those staff members who refused to wear mask[s], and her response was to just keep my mask on." *Id.* at p. 17.  In addition, inmate Lanko indicated that "Me and other inmates confronted the Superintendent about it, and she said that she would check into the situation but never done [sic] anything about it." *Id.* at p. 18.  Finally, inmate Robinson stated that "I spoke with administration staff members about being protected better from their officers who were violating the covid protocols.  Ms. Adams said she would 'look into it,' but I would receive a misconduct if I violated these same protocols." *Id.* at p. 19.

22

held liable in her capacity as a supervisor because there is no evidence that she directed Magoon to violate Conley's rights or, as the person in charge, had knowledge of and acquiesced in Magoon's actions, or that she maintained any policy, practice or custom that caused Conley's asserted harm.

At most, the evidence of record shows that Adams was involved only after-the-fact when inmates complained to her that Magoon came to work on November 3 and November 22, 2022 despite knowing that he was positive for COVID.  This cannot establish Adam's personal involvement.  *See, e.g.*, *Mack v. Warden Loretto FCI*, 839 F.3d 286, 295 (3d Cir. 2016) (affirming district court's decision to dismiss plaintiff's claims against warden and deputy warden because the "complaint makes clear that [plaintiff] only spoke to these defendants after the alleged" act of subordinate occurred and thus provided no basis for inferring that those supervisory defendants were personally involved in the constitutional violation); *Simonton v. Tennis,* 437 F. App'x 60, 62 (3d Cir. 2011) ("[A] prison official's secondary review of an inmate's grievance or appeal is not sufficient to demonstrate the personal involvement required to establish the deprivation of a constitutional right."); *Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006) (plaintiff's allegation that prison officials responded inappropriately, or failed to respond to a prison grievance, did not establish that the official was involved in the underlying unconstitutional conduct).

Moreover, while Conley alleges that he had COVID symptoms, he never tested positive for COVID and there is nothing in his medical chart that he complained of such symptoms.  ECF No. 98-5, ¶¶ 3, 4.  Even if Conley's "symptoms" were shown to be those of COVID-19, there is

no evidence that Adams contracted COVID-19 during the relevant time, and thus she could not have infected Conley.

Conley further claims that Feather, who is the Corrections Healthcare Administrator, is liable because all inmates were not tested. However, the mere fact that every inmate was not tested fails to show that Defendants "knowingly and unreasonably disregarded an objectively intolerable risk of harm," *Beers-Capitol*, 256 F.3d at 132, or that Feather actually knew or was aware of an excessive risk to Conley's safety. *See id*. at 125. As noted in Feather's Declaration, she did not have the authority to implement mass testing; that would have to come from the DOC. ECF No. 98-5, ¶ 8. Moreover, as noted above, inmates who experienced symptoms were tested, but Conley's medical chart does not reflect that he complained of COVID symptoms.

Indeed, Conley's own declaration states that healthcare was providing all the medical attention they could for a presumed COVID case. He states that nurses would pass out pain medications when requested and informed inmates that if they did not need a ventilator, they would not need to be removed from their cells as they were already quarantined. ECF No. 109, ¶¶ 28-29. Further, when Conley's unit was on enhanced quarantine, nurses checked temperatures and pulse oxygen levels twice a day. ECF No. 99, ¶ 30.

Thus, there is no evidence that Feather was deliberately indifferent as it relates to Conley. Furthermore, the other assertions about the refusal to accept sick call slips or faulty thermometers do not implicate Feather personally as there is no evidence that she directed any personnel to refuse sick call slips or did so herself. It is also uncontroverted that she was unaware of any faulty thermometers, and had she been so advised, she would have expected medical staff to replace them. ECF No. 98-5, ¶ 10.

Finally, as Court of Appeals has stated: "In light of these measures and the unprecedented and evolving nature of the pandemic, [plaintiff] does not have a plausible claim that prison officials disregarded an excessive risk of harm." *Mincy v. Governor of Pennsylvania*, 2022 WL 4115485, at *2 (3d Cir. Sept. 9, 2022); *see also, Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir. 2020) (holding that the Bureau of Prisons was not deliberately indifferent to the risk of harm given preventative measures taken in response to COVID-19).

Based on the above, Defendants Wetzel, Adams and Feather are entitled to judgment in their favor with respect to Conley's Eighth Amendment claim against them.

### C.   Eighth Amendment Claim against Defendant Magoon

Conley claims that Magoon contracted COVID-19 in the month of November 2020 and twice bragged about having COVID while at work. Conley has submitted declarations from multiple SCI-Mercer inmates who provide evidence that supports this claim and who also state that Magoon ignored COVID protocols because he did not wear a mask properly or did not wear a mask at all.

Defendants state that Conley's claim fails because Magoon states in his declaration that he was not at work on November 2nd, 3rd, or 22nd, 2020 when Conley claims Magoon was infected and exposed Conley to COVID. ECF No. 100, p. 9; ECF No. 98-1, pp. 2-3. As stated above, Conley must prove that: (1) he was incarcerated under conditions posing a substantial risk of serious harm; (2) the defendant was deliberately indifferent to that substantial risk; and (3) the defendant's deliberate indifference caused the plaintiff to suffer harm." *Bistrian*, 696 F.3d at 367.

In this case, Defendants do not dispute that the COVID-19 pandemic constitutes a substantial risk of harm to inmates. *See Wilkins v. Wolf*, 2021 WL 1578250, at *7 (M.D. Pa.

Apr. 22, 2021); *see also Dixon v. United States*, 2020 WL 3249231, at *3 (D.N.J. June 16, 2020) (concluding that the inmate-plaintiff could meet the objective prong of an Eighth Amendment claim "because COVID-19 is a very contagious virus that can cause serious health complications or death in vulnerable people").  As to prongs two and three there is a genuine issue of material fact as to whether Magoon knowingly came to work while infected with COVID and purposely and with deliberate indifference exposed Conley and other inmates to the virus, recognizing that it will be Conley's burden of proof at trial to establish that he had COVID in November 2020.

Therefore, Defendants' motion for summary judgment will be denied as to Conley's Eighth Amendment claim against Magoon.

### D.  Fourteenth Amendment Claim against All Defendants

It is unclear if the Second Amended Complaint attempts to state a Fourteenth Amendment claim and Defendants do not address it.  At any rate, any due process claim Conley may have attempted to assert under the Fourteenth Amendment fails.[12]  To the extent that he relies upon the absence of a prison grievance system or a failure to follow DOC policies, this does not create a constitutional right.  "Allegations that the DOC failed to follow its regulations or internal policies cannot support a claim based upon a vested right or duty because these administrative rules and regulations, unlike statutory provisions, generally do not create rights in prison inmates."  *Rokita v. Pennsylvania Dep't of Corr.*, 247 A.3d 1192 (Pa. Commw. Ct. 2021).  "If there is no protected

---

[12] The Court may, *sua sponte*, consider Conley's Fourteenth Amendment claim against Defendants pursuant to the screening provisions of the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996). *See, e.g.*, *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 109 n.11 (3d Cir. 2022) (the PLRA's screening provisions at 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c) are "applicable throughout the entire litigation process.") (internal quotation and citation omitted). The Court will evaluate the Fourteenth Amendment claim against Defendants in the interests of judicial economy.

liberty or property interest, it is unnecessary to analyze what procedures were followed when an alleged deprivation of an interest occurred." *Evans v. Fanelli*, 2013 WL 3049112, at *4 (M.D. Pa. June 17, 2013).  *See also Bronson v. Cent. Off. Rev. Comm.*, 721 A.2d 357, 358-59 (Pa. 1998) ("the procedures for pursuing inmate grievances...are a matter of internal prison administration"). In the absence of any protected right, no Fourteenth Amendment due process claim exists.

If Conley has attempted to assert an equal protection claim, it similarly fails.  He acknowledges that all prisoners of H Block and the other housing units were subject to the same protocols and allegedly improper conduct as it relates to COVID issues.  Simply put, his claim is based on prison conditions, not equal treatment of persons of a protected class or a class of one. Thus, if Conley has raised a Fourteenth Amendment claim, all defendants are entitled to summary judgment in their favor.

E.   State Law Claims against All Defendants

Conley has asserted the state-law claims of gross negligence and emotional distress against Defendants.  Defendants argue that these state-law claims are barred under Pennsylvania's sovereign immunity statute, 1 Pa. Cons. Stat. § 2310.  In his brief, Conley "concedes to the dismissal" of his claims of gross negligence and emotional distress.  ECF No. 108, p. 24. Therefore, summary judgment will be granted in favor of all defendants regarding these claims.

V.    **Conclusion**

For the reasons set forth herein, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment (ECF No. 96).  The Motion for Summary Judgment will be granted in favor of defendants Wetzel, Adams and Feather as to all claims asserted against them in this action.  The motion will also be granted as it relates to any Fourteenth Amendment claim and state

law claim that is asserted against Defendant Magoon. Finally, Defendants' motion will be denied with respect to the Eighth Amendment claim against Defendant Magoon.

An appropriate order will follow.

BY THE COURT:

Dated: March 27, 2023

/s/ Patricia L. Dodge
PATRICIA L. DODGE
United States Magistrate Judge